**WO**

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Sean McCarthy, a Student, individually and by and through his Parents John McCarthy and Mary McCarthy, individually, | No. CV18-1351-PHX-DGC |
| Plaintiffs, | **ORDER** |
| v. | |
| Scottsdale Unified School District No. 48, a political subdivision of the State of Arizona; et al., | |
| Defendants. | |

Plaintiff Sean McCarthy and his parents, John and Mary (together "the McCarthys"), sued Defendants Scottsdale Unified School District No. 48 ("the District"), Christopher Satterlie, and others on various constitutional and state law causes of action. Doc. 1 at 1-2. Satterlie moved for partial summary judgment on four of Plaintiffs' claims. Doc. 43. The remaining Defendants joined Satterlie's motion and moved for partial summary judgment on seven of Plaintiffs' claims. Docs. 44, 46.[1] Satterlie joined this motion. Doc. 45. All motions are fully briefed (Docs. 53, 54, 55, 59), and oral argument will not aid in the Court's decision. Fed. R. Civ. P. 78(b); LRCiv 7.2(f). For the reasons set forth below, the Court will grant Satterlie's motion and grant the District's motion in part.

---

[1] For simplicity, the Court will refer to the second motion for summary judgment as "the District's motion."

# I.     Background.

The following facts are largely undisputed.  Where there is a dispute, the evidence will be viewed in the light most favorable to Plaintiffs, the nonmoving parties, and all justifiable inferences will be drawn in their favor.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## A.     The Parties.

Sean McCarthy is the 18-year-old son of John and Mary McCarthy.  He has been diagnosed with Pervasive Developmental Disorder, part of the autism spectrum.  Doc. 1 at ¶¶ 2, 40.  Sean cannot communicate orally.  *Id.* ¶ 3.

Defendants are or were employees of the District and Desert Mountain High School ("the School") and served various roles related to Sean's education.  Doc. 1 ¶¶ 17-34. These roles include the District superintendent (Dr. Denise Birdwell), the District's general counsel (Michelle Marshall), the District's director of special education services (Dawn Schwenckert), the District's assistant superintendent of personnel and specialized services (Pam Sitton), the District's executive director of special education (Diane Bruening), the District's director of special education – compliance (Tara Gonyer), the District's executive director of student and community services (Milissa Sackos), the School principal (Nikki Wilfert), the School's assistant principals (David Vines and Kristopher Alexander), the School's special education teachers (Marjorie Richards, Cindy Guillaume, Laural Onstott, Brian Akmon, and Christoper Satterlie), and the School's psychologist (Andrea Mijak) and paraprofessionals (Marc Telep and Carlos Lopez).  *Id.* ¶¶ 17-31.  For most of the relevant time, Satterlie served as Sean's special education teacher and was responsible for Sean's "day-to-day education, assessment, and supervision."  *Id.*   Telep and Lopez were also responsible for Sean's assessment, support, and supervision.  *Id.* ¶¶ 33-34.   Plaintiffs sue all Defendants in their official capacities and the following Defendants in their individual capacities: Birdwell, Schwenckert, Wilfert, Vines, Alexander, Richards, Onstott, Akmon, Satterlie, Telep, and Lopez.

/ / /

## B. Relevant Facts.

In February 2015, Sean's individual education plan ("IEP") team agreed to send him to a self-contained autism program at the School. *Id.* ¶ 49. Between IEP meetings in March 2015 and January 2016, the McCarthys contacted Sackos, Satterlie, and other Defendants regarding concerns with the adequacy of services provided to Sean. *Id.* ¶ 69. At the January 2016 IEP meeting, the team created a communication goal for Sean. *Id.* ¶ 71. At the May 2016 IEP meeting, the McCarthys became aware that Sean was lashing out in class and had exposed himself on at least one occasion. *Id.* ¶ 78. In October 2016, the McCarthys agreed to allow the District's behavior intervention team to observe Sean for development of a behavior intervention plan ("BIP"). *Id.* ¶ 94. The BIP was created in November 2016. *Id.* ¶ 95.

Plaintiffs contend that rather than implement Sean's BIP, the District and its employees used physical restraints and seclusion techniques to control Sean's behavior. *Id.* ¶ 98.[2] On January 11, 2017, the McCarthys submitted a public records request to the District to obtain Sean's discipline records. *Id.* ¶ 145. Sometime during January 2017, the McCarthys reviewed these documents and learned that the School's employees were using crisis prevention intervention ("CPI") holds on Sean.[3] *Id.* ¶ 148; Doc. 53 at 19 ¶¶ 5, 32 (noting CPI holds on October 7 and December 7, 2016). The McCarthys filed a complaint with the Department of Education Office of Civil Rights ("OCR"). *Id.* ¶ 149. After failing to receive requested documents, the McCarthys filed a second OCR complaint in April 2017. *Id.* ¶ 154.

_____

[2] Plaintiffs provide little evidence of these restraints or periods of seclusion, except for one incident report from January 19, 2019. But Defendants do not dispute any of these facts and their motion for summary judgment does not address them.

[3] CPI holds refer to a variety of non-violent restraints and other techniques intended to be used as emergency intervention to respond to an individual posing an immediate danger to himself or others. *B.H. v. W. Clermont Bd. of Educ.*, 788 F. Supp. 2d 682, 688 n.11 (S.D. Ohio 2011); *Physical Restraint Training*, Crisis Prevention Institute, https://www.crisisprevention.com/Blog/June-2011/Physical-Restraint-Training (last visited July 25, 2019).

On April 13, 2017, the McCarthys and the District participated in a mediation and signed a Settlement Agreement ("the Settlement"). *Id.* ¶ 156. The Settlement resolved all issues and disputes relating to the McCarthys' two OCR complaints. *See* Doc. 43 at 16. The parties agreed that Sean would be placed at Sierra Academy until he graduates or turns 22. *Id.* The District also agreed to pay the McCarthys' legal bills and provide Sean compensatory services in the form of: (1) 208 hours of compensatory education to focus on functional life and job skills; (2) an in-home functional behavioral assessment, a BIP, and 20 hours of parent training; (3) community based services up to $1,500; and (4) consultation with the District's transition specialist to revise Sean's transition plan and address post-secondary employment opportunities. *Id.* at 16-17. The District agreed to provide training to special education staff and administrators on the proper use of restraint and seclusion techniques, reporting requirements, and implementation of IEPs. *Id.* at 17. The District also agreed to provide the McCarthys with all emails related to Sean exchanged between January and May 2016 and March and December 2015. *Id.* The McCarthys agreed that they received adequate consideration to resolve all of their IDEA, ADA, and Section 504 claims against the District. The McCarthys also released the District, its Board members, employees, agents, representatives, successors, assigns, insurers and attorneys from any and all liability, rights, actions, claims, obligations, demands, fees, and costs that arise from or relate to claims under the IDEA. Doc. 43 at 17.

Following execution of the Settlement, the McCarthys learned about an incident on January 19, 2017, where Telep performed multiple CPI holds on Sean and pinned Sean against the wall before "tackling him" to the floor. Docs. 1 ¶ 128, 53 at 50. A draft incident report described Sean as being extremely upset and unable to be calmed by various techniques. Doc. 53 at 50. The report states that Sean got out of his chair and ran towards Telep swinging his fists. *Id.* Telep turned Sean away, so he was facing the wall. *Id.* Sean turned around again, swinging at Telep, who then backed Sean to the corner of the room while shielding himself, and then "turned Sean gently to the floor to prevent him from going after anyone else [nearby]." *Id.* Once Sean calmed down and was ready to stand

back up, Telep took him to the nurse. *Id.* On the way out of the room and down the stairs, Sean lunged at another student coming up the stairs and Telep deflected the swings. *Id.* Attached to the report is an e-mail from Onstott to Sean's math teacher – the author of the incident report – asking her to take out the part that says "he was up against the wall." Doc. 53 at 49. The McCarthys claim to have received a copy of the draft incident report from a private party, not from the document requests sent to the School and District. Doc. 1¶ 162.

The McCarthys contend that if they had known about the January 19 incident before the OCR complaint mediation, they would not have signed the Settlement. Doc. 1 ¶ 167. After the Settlement, the McCarthys went back and forth with the School and District to obtain more information about Sean's classroom experiences and discipline, but they never initiated an IDEA due process complaint. Docs. 1 ¶¶ 156-66, 43 at 21.

**C.  The Claims.**

Plaintiffs filed this suit on May 1, 2018. Doc. 1 at 43. Sean asserts the following causes of action individually: (1) a § 1983 claim for violation of Fourth Amendment rights against all Defendants (Count 1); (2) a § 1983 claim for violation of Fifth Amendment rights against all Defendants (Count 2); (3) a § 1983 claim for violation of Fourteenth Amendment rights against all Defendants (Count 3); (4) a § 1985 action for conspiracy to interfere with civil rights against the District, Birdwell, Marshall, Schwenckert, Sitton, Bruening, Gonyer, Sackos, Wilfer, Vines, and Alexander (Count 4); (5) assault against Satterlee, Telep, Akmon, and Lopez (Count 8); (6) battery against Satterlee, Telep, Akmon, and Lopez (Count 9); (7) aiding and abetting tortious conduct against the District, Birdwell, Marshall, Schwenckert, Sitton, Bruening, Gonyer, Sackos, Wilfert, Vines, Alexander, Richards, Onstott, Guillaume, and Mijak (Count 10); (8) negligence against all Defendants (Count 11); and (9) negligent hiring, training, and supervision against the District, Birdwell, Schwenckert, Sitton, Bruening, Gonyer, Sackos, Wilfert, Richards, Onstott, and Guillaume (Count 13). The complaint alleges four claims on behalf of all Plaintiffs and against all Defendants: (1) discrimination in violation of § 504 of the Rehabilitation Act

("§ 504") (Count 5); (2) discrimination in violation of the Americans with Disabilities Act ("ADA") (Count 7); (3) gross negligence (Count 12); and (4) violation of A.R.S. § 15-105 (Count 14). Mary asserts one cause of action individually for retaliation in violation of § 504 against the District and Birdwell (Count 6).

Plaintiffs seek to enjoin Defendants from violating federal and state civil rights and discrimination laws. Doc. 1 at 42. They request a declaration that the District's policies, procedures, and practices concerning the discipline and behavior management of children with disabilities denied Sean his right to full and equal access to, and use and enjoyment of, the facilities, programs, services, and activities of the District. *Id.* They request compensatory damages for (1) costs for Sean's medical care, medications, and psychiatric or psychological treatment and assessments to deal with the severe emotional distress and physical harm caused by Defendants; (2) costs for social and psychological interventions and programs needed to assist Sean; (3) costs for tutoring or other programs to remediate the academic regression and lack of academic progress caused by Defendants' actions; (4) costs of expanded long-term care as a result of Sean's regression; (5) Sean's loss of future income from his expected employment in an entry-level job in the food service industry; (6) Sean's loss of companionship; and (7) general damages for pain and suffering, stress, and emotional damages caused by Defendants. *Id.* Plaintiffs also seek punitive damages and attorneys' fees. *Id.*

### D. Phase I.

In a July 31, 2018 case management order, Judge Humetewa provided for a phased discovery and summary judgment briefing schedule. Doc. 32 at 5. Defendants motions are based on Phase I discovery, which consisted of the documents related to exhaustion of administrative remedies, filing of notices of claim, the Settlement, and the statute of limitations. *Id.*; *see also* Doc. 43, 44.

## II. Legal Standard.

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which

it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Only disputes over facts that might affect the outcome of the suit will preclude summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.  Background Law.

### A.  IDEA Background.

The Individuals with Disabilities Education Act ("IDEA") grants federal funds to states for educating children with disabilities. *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 991 (2017). The IDEA conditions receipt of funding on compliance with certain statutory requirements, including that states provide every eligible child a free and appropriate public education ("FAPE") by means of an IEP. *Id*; *see also* 20 U.S.C. §§ 1401(9)(D), 1412(a)(1). Children with disabilities and their parents are provided with extensive procedural protections set out in 20 U.S.C. § 1415. In particular, the statute requires States to provide aggrieved parties with the opportunity to mediate their disputes (§ 1415(e)), to secure an impartial due process hearing to resolve certain differences with state agencies (§ 1415(f)), and to appeal any decision and findings to the state educational agency (§ 1415(g)). *See Payne v. Peninsula Sch. Dist.*, 653 F.3d 863, 876 (9th Cir. 2011), *overruled on other grounds by Albino v. Baca*, 747 F.3d 1162, 1171 (9th Cir. 2014).

A FAPE is an education that "confer[s] some educational benefit upon the handicapped child." *Bd. of Educ. of the Henrick Hudson Cent. Sch. Dist. v. Rowley*, 458

U.S. 176, 192, 201 (1982). It "comprises 'special education and related services' – both 'instruction' tailored to meet a child's 'unique needs' and sufficient 'supportive services' to permit the child to benefit from that instruction." *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 748-49 (2017) (citing 20 U.S.C. §§ 1401(9), (26), (29)).

The IEP is the primary vehicle for providing each child with a FAPE. *Id.* at 750. "Crafted by a child's 'IEP Team' – a group of school officials, teachers, and parents – the IEP spells out a personalized plan to meet all of the child's 'educational needs.'" *Id.* (citing 20 U.S.C. § 1414(d)(1)(A)(i)(II)(bb), (d)(1)(B)). The IEP documents the child's current levels of academic achievement, identifies measurable annual goals, and lists the special education services and accommodations that will be provided so the student can advance toward these goals and access the general education curriculum. *Id.* (citing § 1414(d)(1)(A)(i)(I), (III), (IV)(aa)).

In the development of the IEP, the team considers a child's behavior that impedes learning and the use of "positive behavioral interventions." 20 U.S.C. § 1414 (d)(3)(B)(i). Although not always necessary, failure to provide or follow an appropriate BIP could affect provision of a FAPE. *See*, *e.g.*, *A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1206 (9th Cir. 2016) (finding a material issue of fact as to whether a BIP and personal aide were necessary to provide student a FAPE); *E.H. v. N.Y.C. Dep't of Educ.*, 164 F. Supp. 3d 539, 554 (S.D.N.Y. 2016) (inadequate BIP denied student a FAPE).

**B.      A.R.S. § 15-105.**

Section 15-105 permits schools to use restraint or seclusion techniques when a pupil's behavior presents an imminent danger of bodily harm to the pupil or others, and less restrictive interventions appear insufficient to mitigate the danger. A.R.S. § 15-105(A). The technique may be used only by "school personnel who are trained in the safe and effective use of restraint and seclusion techniques unless an emergency situation does not allow sufficient time to summon trained personnel." *Id.* § 15-105(B)(3). The statute requires schools to "provide the pupil's parent or guardian with written documentation that includes information about any persons, locations or activities that may

have triggered the behavior, if known, and specific information about the behavior and its precursors, the type of restraint or seclusion technique used and the duration of its use." *Id.* § 15-105(D)(2). The statute defines restraint as "any method or device that immobilizes or reduces the ability of a pupil to move the pupil's torso, arms, legs, or head freely, including physical force or mechanical devices." *Id.* 15-105(G)(1). Restraint does not include:

> [1] Methods or devices implemented by trained school personnel or used by a pupil for the specific and approved therapeutic or safety purposes for which the method is designed, and if applicable, prescribed.
>
> [2] The temporary touching or holding of the hand, wrist, arm, shoulder or back for the purpose of inducing a pupil to comply with a reasonable request or go to a safe location.
>
> [3] The brief holding of a pupil by one adult for the purpose of calming or comforting the pupil.
>
> [4] Physical force used to take a weapon away from a pupil or to separate and remove a pupil from another person when the pupil is engaged in a physical assault on another person.

*Id.* § 15-105(G)(1)(a)-(d).

## IV. Satterlie's Motion.

Satterlie moves for summary judgment on Counts 2, 3, 5, and 7. Doc. 43 at 1. He argues that these claims are barred by the Settlement, and that Plaintiffs failed to exhaust their administrative remedies under the IDEA. *Id.*

### A. The Settlement Release.

The parties' Settlement contains the following release provision:

> Parent's Release: Parents acknowledge and agree that the consideration set forth herein is reasonable and adequate to resolve their IDEA, ADA and Section 504 claims against the District. In exchange, Parents release and forever discharge the District and its Board members, employees, agents, representatives, successors, assigns, insurers and attorneys from any and all liability, rights, actions, claims, obligations, demands, fees, and costs known or unknown at the time of execution of this agreement that arise from or related to claims under the [IDEA]. This

includes, but is not limited to all claims based on or arising from federal or state law, known or unknown at the time of execution of this agreement, the District's alleged failure to provide appropriate services or that pertain to claims of retaliation, discrimination, or the identification, evaluation, educational placement or the provision of FAPE under the IDEA, ADA, and Section 504 to the Parents that may be filed with any State or Federal agencies . . . or State or Federal courts, except that Parents retain the right to file Section 504 and personal injury claims in State or Federal courts.

*Id.* at 17-18 ("the Release"). Defendants argue that the Release expressly bars Counts 2, 3, 5, and 7 because they arise from or are related to the IDEA. Doc. 43 at 3. Plaintiffs respond that the plain language and circumstances of the Release do not bar Sean's claims, and that the McCarthys expressly reserved the right to file § 504 and personal injury claims. Doc. 53 at 2.

In Arizona, courts interpret contracts according to the parties' intent. *Taylor v. State Farm Mut. Auto Ins.*, 854 P.2d 1134, 1138 (Ariz. 1993); *see D.R. ex rel. M.R. v. E. Brunswick Bd. of Educ.*, 109 F.3d 896, 898 (3d Cir. 1997) (recognizing that the settlement agreement between parents and school district was a binding contract); Doc. 43 at 18 (agreement should be construed in accordance with Arizona law). The Court first considers the plain meaning of the words in the context of the contract as a whole. *Grosvenor Holdings, L.C. v. Figueroa*, 218 P.3d 1045, 1050 (Ariz. Ct. App. 2009). The Court must "apply a standard of reasonableness to contract language" and construe the contract "in its entirety and in such a way that every part is given effect." *Goddard v. R.J. Reynolds Tobacco Co.*, 75 P.3d 1075, 1078 (Ariz. Ct. App. 2003) (citations and quotation marks omitted). The Court must also consider any relevant extrinsic evidence, and if "the contract language is 'reasonably susceptible' to the interpretation asserted by its proponent, the evidence is admissible to determine the meaning intended by the parties." *Taylor*, 854 P.2d at 1140 (citation omitted). With these principles in mind, the Court will interpret the Release by considering its language and extrinsic evidence concerning the parties' intent, including "negotiation, prior understandings, and subsequent conduct[.]" *Id.* at 1139; *see generally* Restatement (First) of Contracts § 235.

The Release and the Settlement refer to the allegations in Plaintiffs' OCR complaints. The parties have included only the first complaint in the record. Doc. 44 at 15-16. It alleges that Defendants failed to follow Sean's IEP and provide appropriate services, Sean developed behavior problems as a result, Sean regressed, Sean's behavior plan was not being implemented correctly, and Sean had been subjected to CPI holds from several staff members, but the McCarthys were not notified. *Id.* The Settlement resolves these allegations as they pertain to the ADA, IDEA, and § 504 claims. Doc. 43 at 17.

The Release's plain language shows that the McCarthys released Defendants from all past and present ADA, IDEA, and § 504 claims. They also released all liability or claims that originate from or are in some way connected to the IDEA. This includes claims originating from or connected to state or federal law or the District's failure to provide appropriate services, and claims related to the District's alleged retaliation or discrimination, or the identification, evaluation, educational placement, or provision of a FAPE under the IDEA, ADA, and § 504. Doc. 43 at 18; Black's Law Dictionary (11th ed. 2019) (defining Arise and Related). The Court will address each challenged claim to determine if it is covered by the Release language.

### 1. The Background Facts.

Each challenged claim incorporates the background facts by reference. The Court will therefore discuss those facts first.

A number of the background facts specifically allege Defendants' failure to provide the special services and accommodations that make up a FAPE. For example, Plaintiffs allege that Defendants repeatedly denied Sean required accommodations and services in the classroom, failed to implement Sean's IEP, failed to properly train employees and special needs educators about the specific services that should have been provided to Sean so he could access his education, and used untrained and unqualified individuals to provide those inadequate services. Doc. 1 ¶¶ 4, 9, 58, 97, 173. Plaintiffs allege that Sean was wrongly denied the ability to attend a computer skills class because of his behavior, and that his behavior was out of control because Defendants failed to employ the appropriate

accommodations and services to allow Sean to communicate. *Id.* ¶¶ 60-63. According to Plaintiffs, Defendants denied Sean access to visual schedules and directions, despite the fact that these were important to his ability to communicate and a part of his IEP. *Id.* ¶ 65. His inability to communicate led to increased negative behaviors. *Id.* ¶ 66. Defendants' conduct only exacerbated the problem, leading to an even greater increase in aggressive behaviors. *Id.* ¶¶ 68, 72, 76, 81, 84, 89. Sean's aggressive behaviors also resulted from Defendants asking Sean to work on inappropriate educational activities and goals, which only frustrated him and caused him to act out. *Id.* ¶¶ 90-93.

Further, the allegations address the inadequacy of Sean's IEP and Defendants' violations of the IDEA and § 15-105. *Id.* ¶ 86. The complaint alleges that the IEP's behavioral goals did not reflect Sean's behavior in the classroom, and the School failed to adequately communicate to the McCarthys the extent of Sean's behavioral issues during IEP meetings. *Id.* ¶¶ 51-52. When Sean's behavior worsened, Defendants failed to convene an IEP meeting to address the behavior. *Id.* ¶¶ 68, 76. The complaint alleges that Sean's IEP did not include a BIP with restraint options or address when CPI holds should be used. *Id.* ¶ 54. When a BIP was finally created, the School never followed it. *Id.* ¶ 95. Sean's IEP did not comply with federal and District guidelines and requirements. *Id.* ¶ 85. And the McCarthys were consistently deprived of formal documentation regarding specific incidents and use of restraint or CPI techniques in violation of § 15-105. *Id.* ¶¶ 78-79, 141. Plaintiffs further allege that the District's policy of not requiring compliance with § 15-105 denied Sean a FAPE "because it treated him differently than non-disabled students and caused new academic and behavioral issues that were never addressed." *Id.* ¶ 143.

Plaintiffs' background allegations focus on Defendants' restraint and seclusion techniques, alleging that they were excessive, unlawful, and illegally used for punishment purposes. *Id.* ¶ 99. They allege that "on multiple occasions, Telep admitted to using restraint and seclusion techniques, where no threat of danger was present, in order to punish Sean." *Id.* ¶ 104. Plaintiffs allege that none of the individuals performing these restraints or CPI holds were certified in CPI techniques. *Id.* ¶¶ 119-23. Plaintiffs allege that (1) "[o]n

- 12 -

at least one occasion Sean was tackled to the floor by [Telep]"; (2) "[o]n more than one occasion, [Telep and Akmon] pushed Sean and pinned him against a wall"; (3)"[o]n multiple occasions [Lopez] forcibly removed Sean from his learning environment, secluding him from other students"; (4)"[o]n January 19, 2017, [Telep] performed multiple 'CPI holds' on Sean and used unlawful and excessive force to pin Sean against the wall and tackle Sean to the floor"; and (5) "[o]n January 19, 2017, Telep held Sean on the floor, immobilizing Sean's arms and legs for an extended period of time." *Id*. ¶¶ 124-29.

In multiple paragraphs of their complaint, Plaintiffs tie these allegations of excessive and unlawful restraint to Sean's educational rights and FAPE and allege that these restraints were a result of Defendants failing to implement the IEP and BIP and failing to provide Sean with the appropriate accommodations to address his frustration and behaviors. *Id.* ¶¶ 97-98. For instance, Plaintiffs allege that Sean was not adequately challenged, but instead "asked to work on goals that he had long ago mastered and would easily lose interest in[.]" *Id.* ¶ 91. "The lack of interest that Defendants created often led Sean to act out physically." *Id.* ¶ 92.

As to injuries, Plaintiffs allege that Defendants' acts caused academic and behavioral regression. *Id.* ¶ 6. Plaintiffs allege that Sean was denied appropriate educational benefits and that Defendants' actions violated his right to be free from discrimination and denied Sean a FAPE. *Id.* ¶ 170. As discussed above, the remedies Plaintiffs seek are declaratory relief that Sean was essentially denied access to the programs and facilities of the District. *Id.* at 42. Plaintiffs also seek costs for tutoring and academic remediation, long-term care for Sean's behavioral regression, and loss of future income from his expected employment. *Id.* at 43.

In sum, Plaintiffs' background facts center on Defendants' failure to follow educational regulations and accommodate Sean so he could adequately access his educational benefits, which led to his behavioral issues and Defendants' use of restraints. Even though the background facts include numerous references to excessive or unlawful restraints, they are tied to Defendants' actions regarding Sean's education and, from the

- 13 -

incident report provided, appear to be related to behavior control in the classroom. Further, all of the alleged incidents occurred prior to the parents filing the OCR complaint. Plaintiffs also request compensatory education and care for behavioral regression, which demonstrate that they are seeking relief for an inappropriate education. *See B.H. v. W. Clermont Bd. of Educ.*, 788 F. Supp. 2d 682, 700 (S.D. Ohio 2011) ("Compensatory education is meant to 'place children in the position they would have been in but for the violation of the [the IDEA]." (quoting *Draper v. Atlanta Indep. Sch. Sys.*, 518 F.3d 1275, 1289 (11th Cir. 2008)).

### 2. Count 2 Due Process Claim.

Count 2 incorporates the complaint's background facts and contains the following statements: "under the Fifth and Fourteenth Amendments to the United States Constitution, Sean has a right to be free from deprivations of liberty without due process of law." Doc. 1 ¶ 186. Defendants acted under color of law in violation of Sean's Fifth and Fourteenth Amendment rights when they restrained him. *Id.* ¶ 187. Sean was deprived of liberty when he was restrained and removed from his peers without due process. Doc. 1 ¶ 188. Plaintiffs further allege that Defendants did not evaluate whether their actions were appropriate in light of Sean's disabilities in violation of his Fifth and Fourteenth Amendment rights to due process. *Id.* ¶ 189. Plaintiffs allege that "as a direct result of Defendants' deprivation of Sean's rights, he has suffered damages and is entitled to be compensated for those damages in an amount to be proven at trial." *Id.* ¶ 190.

Considering the background facts discussed above, all of the restraints Defendants are accused of imposing resulted from Defendants' alleged failure to properly implement and amend Sean's IEP in the period preceding the Settlement. Doc. 1 ¶¶ 4, 58-67, 84, 89-95, 97-99. Plaintiffs place the restraints in the context of § 15-105, which specifically allows the use of restraints so long as they satisfy specific standards imposed only on schools. Indeed, Plaintiffs' allegations reference the possibility that restraints and CPI holds could be part of Sean's IEP. *Id.* ¶ 54. And although Plaintiffs allege that the force was excessive, they at no point allege that it was unnecessary except in the context that

Sean would not have required restraint had his IEP been followed or amended properly. Count 2 fits squarely within the plain language of the Release: a claim "based on or arising from federal . . . law . . . [for] the District's alleged failure to provide appropriate services . . . or the provision of FAPE under the IDEA, ADA, and Section 504[.]" Doc. 43 at 17. *See also D.M. v. Board of Education Toledo Public Schools*, 359 F. Supp. 3d 537, 540 (N.D. Ohio 2019) (restraint claim was actually for denial of a FAPE because it resulted from the teacher attempting to discipline and control classroom behavior); *Parrish v. Bentonville*, No. 5:15-cv-05083, 2017 WL 1086198, at *28-32 (W.D. Ark. March 22, 2017) (restraint claim was for denial of a FAPE because it was in response to misbehaviors at school). Count 2 is barred by the Release.

### 3. **Count 3 Equal Protection**.

Count 3 realleges and incorporates all of the background facts. Doc. 1 ¶ 191. It then states that "[a]ll of Defendants' actions or inactions resulted in Sean being deprived of equal protection under the law because of his disabilities." *Id.* ¶ 192. Plaintiffs allege that "Sean was restrained because of his disabilities where non-disabled students were not restrained in the same way." *Id.* ¶ 194.

Sean's equal protection claim involves all of Defendants alleged actions in the background facts, including failing to implement and amend Sean's IEP and failing to report restraint incidents per § 15-105. Further, Count 3 involves the school's use of restraints as authorized by § 15-105. These allegations are specific to the school setting and involve the same facts, as discussed above, that implicate Sean's denial of a FAPE. Count 3 also is covered by the plain language of the Release.

### 4. **Count 5 § 504 Claim.**

While the Release specifies that all claims for provision of a FAPE under § 504 are precluded, it also reserves the right for the parents to file § 504 claims. *See* Doc. 43 at 18. What the parties intended by this contradictory language is unclear. Plaintiffs argue that the language "clearly and expressly intended that Mary and John McCarthy would 'retain the right to file" Count 5 of the complaint. Doc. 53 at 6. Defendants assert that the Release

bars all claims under § 504 related to the provision of a FAPE, but they do not specifically address the Release's reservation of the parents' right to file a § 504 claim for issues outside the provision of a FAPE. This portion of the contract is ambiguous, and both parties present plausible interpretations. The Court cannot resolve this issue as a matter of law. A genuine dispute of fact regarding the parties' intent precludes summary judgment. *Hartford v. Indust. Comm'n of Ariz.*, 870 P.2d 1202, 1207 (Ariz. Ct. App. 1994) ("Any ambiguity is subject to a factual determination concerning the intent of the parties and is to be resolved conclusively by the trier of fact.").

### 5.    Count 7 ADA Claim.

Count 7 incorporates the background facts and alleges that "Defendants have failed in their responsibilities under Title II to provide their services, program, and activities in a full and equal manner to disabled persons as described herein, including failing to ensure that Sean received appropriate behavioral assessments and supports, failing to appropriately address Sean's disability-related behaviors, and failing to provide accommodations such that Sean could communicate and access curriculum." *Id.* ¶ 225. Plaintiffs characterize these allegations as Defendants' failure to provide equal access to their programs and services, but Defendants' programs and services consist of providing an education. Plaintiffs therefore necessarily allege that Defendants failed to provide what the law required of them – a FAPE. *See cf. Wellman v. Butler Area Sch. Dist.*, 877 F.3d 125, 133 (3d Cir. 2017) (alleged failure to accommodate the student's condition and fulfill his educational needs was a claim related to a FAPE). Because this claim involves the denial of appropriate educational services and accommodations and, essentially, the denial of a FAPE, it is covered by the language of the Release.

### 6.    Release of Sean's Claims.

Plaintiffs argue that because the Settlement individually defines the McCarthys as "the Parents" and Sean as "the Student," the Release, which is titled "Parents' Release," covers only the McCarthys' claims. Doc. 53 at 3. Plaintiffs argue that this interpretation

is consistent with the IDEA scheme, which considers the rights of parents until the child reaches the age of majority. *Id.*

The Court does not agree. The Settlement was entered into "on behalf of Sean" (Doc. 43 at 16, 18), and the IDEA expressly provides that disputes may be finally resolved between parents and educators, *see* 20 U.S.C. § 1415. Section 1415(e) requires that procedures be established "to allow parties to disputes involving any matter . . . to resolve such disputes through a mediation process." *Id.* at § 1415(e)(1). If "a resolution is reached to resolve the complaint through the mediation process, the parties shall execute a legally binding agreement that sets forth such resolution[.]" *Id.* at § 1415(e)(2)(F). The settlement is to be "signed by both the parent and a representative of the agency," and "is enforceable in any State court of competent jurisdiction or in a district court of the United States." *Id.* at § 1415(e)(2)(F)(ii), (iii). In short, the IDEA expressly provides that disputes may be resolved by "legally binding" agreements executed by parents. *See also* Ariz. Admin. Code § R7-2-405.02 (mediation settlement to be signed by parent); *Anderson v. Abington Heights Sch. Dist.*, No. 3:12-CV-2486, 2017 WL 6327572, at *12-14 (M.D. Pa. Dec. 11, 2017) (statute clearly permits the minor's parents to enter a Settlement releasing the minor's educational claims). Thus, by releasing the claims related to Sean's education, the McCarthys have finally resolved those claims in a binding settlement agreement.[4]

Interpreting the contract in this manner also gives effect to the contract as a whole, which contemplates resolution of all claims from Plaintiffs' OCR complaints, payment of Sean's legal fees, and benefits to both Sean and the McCarthys. Doc. 43 at 17.

### 7. Evidence of the Parties' Conduct.

Plaintiffs also argue that subsequent conduct of the parties demonstrates an understanding that Plaintiffs would file a lawsuit following the Settlement. Plaintiffs argue

---

[4] Plaintiffs argue that an Arizona Probate Court rule requires court approval of a civil settlement on behalf of a minor. Doc. 53 at 3 (citing Ariz. R. Probate. P. 37(a) and A.R.S. § 14-5301). But whatever protections Arizona has put in place for general civil cases involving minors, Congress has provided in the IDEA that parents may enter legally binding settlement agreements with educators.

that immediately after finalizing the Settlement, Defendants' attorney stated: "Well, that's done, but you're just going to turn around and sue us." Doc. 53 at 5. Then, Plaintiffs assert, Defendants did not mention the Settlement when Plaintiffs filed their notice of claim with the District, and initially did not plead the Settlement as an affirmative defense in their answers. *Id.* Only after Satterlie's attorney mentioned the Settlement in the Rule 16 scheduling conference did the other Defendants start asserting that the Settlement was a defense in this action. *Id.* at 6. According to Plaintiffs, this conduct indicates that the District, its attorney, and other Defendants believed the Settlement did not bar Plaintiffs' claims.

Arizona applies a liberal version of the parol evidence rule: "the judge first considers the offered evidence and, if he or she finds that the contract language is 'reasonably susceptible' to the interpretation asserted by the proponent, the evidence is admissible to determine the meaning intended by the parties." *Taylor*, 854 P.2d at 1140. Subsequent conduct of the parties may be considered as evidence supporting the proponent's interpretation. *Id.* at 1143.

The Court cannot conclude that the Settlement and Release terms are reasonably susceptible to Plaintiffs' interpretation. The plain language of the Release extinguishes a host of claims. Plaintiffs' interpretation would not provide a plausible alternative meaning for this language – it would entirely nullify the language.

Nor does the lawyer's post-settlement statement support Plaintiffs' radical nullification of the Release. In the first place, it is not clear why the lawyer's statement should be viewed as reflecting the parties' intent. But even if it could, the statement almost certainly referred to the Release's preservation of Plaintiffs' ability to sue Defendants for § 504 and personal injury claims. There is no reason to view it as suggesting that the entire Release was meaningless.

Further, Defendants' delay in asserting the Release as an affirmative defense is simply not persuasive evidence that the parties intended the Release to have no meaning. There are any number of reasons the attorneys could have failed initially to assert an

affirmative defense, especially when some Defendants did not know about the Settlement until the parties' mandatory disclosures. Doc. 49 at 4.

### 8. Conclusion.

The Court finds that Counts 2, 3, and 7 are barred by the Release and will grant Defendants' motion for summary judgment on those claims.

### B. Administrative Exhaustion.

Satterlie argues that Counts 2, 3, 5, and 7 essentially seek relief for Defendants' alleged failure to provide Sean with a FAPE, and, as a result, Plaintiffs were first required to exhaust these claims by filing a due process complaint under the IDEA. Doc. 43 at 7. Plaintiffs contend that administrative exhaustion is not required because these claims fall outside the IDEA, and exhaustion otherwise is unnecessary because the mediation resolved Plaintiffs' IDEA claims. Doc. 53 at 7-14. Because the Court will grant summary judgment on Counts 2, 3, and 7 based on the Release, the Court considers only whether Count 5 requires exhaustion.

### 1. Legal Standard.

Along with the IDEA, Title II of the ADA and § 504 protect the interests of children with disabilities. *Fry*, 137 S. Ct. at 746. Title II forbids any public entity from discriminating based on disability. 42 U.S.C. §§ 12131-12132. Section 504 applies the same prohibition to any federally funded "program or activity." 29 U.S.C. § 794(a). Both statutes authorize individuals to seek redress for violations by bringing suits for injunctive relief or money damages. *See* 29 U.S.C. § 794a(a)(2); 42 U.S.C. § 12133.

In *Smith v. Robinson*, 468 U.S. 992, 1009 (1984), the Supreme Court considered the interaction between § 504, Title II of the ADA, and the IDEA, and held that the IDEA was "the exclusive avenue" through which a child with a disability could challenge the adequacy of his or her education. *Fry*, 137 S. Ct. at 746. Congress responded by passing the Handicapped Children's Protection Act of 1986, which overturned the preclusion of relief under § 504 and the ADA and added a carefully defined exhaustion provision. *Id*. The exhaustion provision provides:

Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. § 1415(l).

This exhaustion requirement is "designed to allow[] for the exercise of discretion and educational expertise by state and local agencies, afford[] full exploration of technical educational issues, further[] development of a complete factual record, and promote[] judicial efficiency by giving . . . agencies the first opportunity to correct shortcomings in their educational programs for disabled children." *Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1303 (9th Cir. 1992). The exhaustion requirement recognizes that Congress has primarily charged local educational agencies with the responsibility of fulfilling the requirements of the IDEA, and that the states have the responsibility of ensuring that local agencies comply. *Id.* Requiring exhaustion "prevent[s] courts from acting as ersatz school administrators and making what should be expert determinations about the best way to educate disabled students," while maintaining liability "for conduct that violates constitutional and statutory rights that exist independent of the IDEA[.]" *Payne*, 653 F.3d at 876.

Whether a claim requires exhaustion "hinges on whether a lawsuit seeks relief for the denial of a [FAPE]." *Fry*, 137 S. Ct. at 753 ("The only relief that an IDEA officer can give – hence the thing a plaintiff must seek in order to trigger § 1415(l)'s exhaustion rule – is relief for the denial of a FAPE."). If a lawsuit charges such a denial, the plaintiff cannot escape § 1415(l) merely by bringing suit under a statue other than the IDEA." *Fry*, 137 S. Ct. at 754. But a suit brought under a different statute, not seeking a denial of a FAPE, need not be exhausted. *Id.* A plaintiff in that situation would not get any relief from a hearing officer even if the suit arose "from a school's treatment of a child with a disability

– and so could be said to relate in some way to her education." *Id*. The Court looks to the gravamen of the Plaintiffs' complaint to determine whether it seeks such relief. *Id*. at 753.

In *Fry*, a school refused to permit a student with cerebral palsy to use her service dog and instead provided a human aide, asserting that the dog was not necessary to provide the student a FAPE. *Id*. at 751-52. The parents filed a complaint with the OCR, but did not exhaust their IDEA remedies. *Id*. The parents then filed a federal suit alleging violations of the ADA and § 504. *Id*. at 752. The district court dismissed the suit, holding that the parents failed to exhaust their administrative remedies. *Id*.

In considering the gravamen of the parents' complaint, *Fry* stressed the need to set aside artful pleading and analyze the complaint's substance. *Id*. at 755. The Court posed a pair of hypothetical questions to aid the inquiry: (1) "could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was not at a school"; and (2) "could an adult at the school – say, an employee or visitor – have pressed essentially the same grievance." *Id*. at 756. For example, a student who is denied a wheelchair ramp to access a school building can sue the school under the ADA or § 504, and could also sue another public entity for the same conduct – failure to provide a reasonable accommodation or modification. *Id*. Such a claim would not be based on denial of a FAPE. But a child who does not receive remedial math tutoring to accommodate his learning disability, while possessing a cognizable claim against the school under § 504 or the ADA, could not assert such a claim against other public entities that don't provide education. Such a claim seeks relief for denial of a FAPE. *Id*. at 756-57.

The Court also considered whether the plaintiffs had previously invoked the IDEA's formal procedures to handle the dispute. *Id*. A "plaintiff's initial choice to pursue the process may suggest that she is seeking relief for the denial of a FAPE – with the shift to judicial proceedings prior to full exhaustion reflecting only strategic calculations about how to maximize the prospects of such a remedy." *Id*.

*Fry* ultimately found that "nothing in the nature of the [parents'] suit suggest[ed] any implicit focus on the adequacy of [the student's] education." *Id*. at 758. The parents

could have filed the same claim at any other public institution on behalf of their daughter, and an adult visitor or teacher at the school could have filed the same claim if denied use of a service dog. *Id.* But the Court remanded the case to determine to what extent the parents invoked administrative remedies under the IDEA prior to filing their claim with the court, which would serve as evidence they were seeking a denial of a FAPE. *Id.*

With this guidance in mind, the Court turns to Plaintiffs' complaint as a whole and the challenged claims.

### 2. The Complaint as a Whole.

*Fry* looked to the "gravamen of the complaint" as a whole, but the hypothetical questions and the application of the *Fry* test seem to suggest analysis of individual claims. *Id.* at 755; *Wellman v. Butler Area Sch. Dist.*, 877 F.3d 125, 132 (3d. Cir. 2017) (noting that Black's Law Dictionary defines gravamen as the "substantial point or essence of a claim, grievance, or complaint" (citation omitted)); *S.B. v. Cal. Dep't of Educ.*, 327 F. Supp. 3d 1218, 1250 (E.D. Cal. 2018) (considering each claim separately); *Paul G. v. Monterey Peninsula Sch. Dist.*, No. 16-cv-055582-BLF, 2018 WL 2763302, at *5 (N.D. Cal. June 8, 2018) (same). The Court concludes that the proper analysis requires consideration of the gravamen of the individual challenged claims, as well as the complaint as a whole. *See Wellman*, 877 F.3d at 132-33 ("For example, if a student who was challenging the sufficiency of her IEP also happened to be physically assaulted on the bus going to school, one could envision the plaintiff bringing a single complaint with different claims arising from her school experience, one of which seeks relief for physical injuries sustained while on the school bus and which has nothing to do with her access to a FAPE and IDEA relief."); *K.G. ex rel. Gosch v. Sergeant Bluff-Luton Cmty. Sch. Dist.*, 244 F. Supp. 3d 904, 920-23 (N.D. Iowa 2017) (considering the complaint as a whole and the claims individually).

The complaint's background facts allege that Sean was not provided adequate educational accommodations consistent with his IEP and BIP. This failure led to increased aggressive behaviors in the classroom and Defendants' use of restraints to control those

behaviors.  The parents were often left out of notifications and necessary conversations, in violation of A.R.S. § 15-105 and the IDEA.  And Sean's IEP was not appropriately updated to address these issues.  The gravamen of these facts is a denial of a FAPE.  *See Smith v. Rockwood R-VI Sch. Dist*., 895 F.3d 566, 569 (8th Cir. 2018) (exhaustion required where the complaint alleged exclusion and deprivation of education benefits, even though plaintiffs allege "disability discrimination" in other parts of the complaint); *S.B.*, 327 F. Supp. 3d at 1252 (claims that plaintiff was discriminated against because the school failed to ensure that appropriate residential treatment centers were available predicated on the notion that plaintiff required residential treatment, which was an issue with plaintiff's IEP).

### 3.    Count 5's Allegations.

Count 5 alleges a violation of § 504.  *Id.* ¶ 201.  Plaintiffs allege that Defendants' acts and omissions, deliberate indifference, failure to conduct appropriate behavioral assessments and behavior analyses, and their use of excessive and inappropriate restraints, "caused Sean heightened behavior problems and physical and emotional symptoms which interfered with his right to receive a free and appropriate public education."  *Id.* ¶ 206. Defendants also failed to provide appropriate support services and to allow Sean access to educational services, programs, and facilities.  *Id.* ¶ 207.  "Defendants actions and omissions defeated and impaired the accomplishment of the goals and objectives of Sean's IEP and other services provided to him as a student with disabilities."  *Id.* ¶ 208.  And Defendants' deliberate indifference of Sean's rights under § 504 "denied Sean equal access to educational services in direct violation of Sean's rights under Section 504[.]"  *Id.* ¶ 209.

All of the allegedly denied services and programs identified in Count 5 and the background facts relate to educational services and accommodations specifically related to Sean's right to a FAPE.  Count 5 seeks to recover for denial of a FAPE, and therefore requires exhaustion.  *See Fry*, 137 S. Ct. at 754; *see also Wellman*, 877 F.3d at 133 (requiring exhaustion where all claims related to "the alleged failure to accommodate [the student's] condition and fulfill his educational needs"); *J.M. v. Francis Howell Sch. Dist.*,

850 F.3d 944, 949-50 (8th Cir. 2017) (requiring exhaustion where claims "are based on the failure to implement [student's] IEP, specifically regarding discipline").

Answering the *Fry* hypothetical questions: Plaintiffs would be unable to seek a remedy for these alleged wrongs against a non-educational public entity. Sean does not have a right to appropriate behavioral supports and access to educational services and curriculum in a setting outside of a school. 137 S. Ct. at 755; *Durbrow v. Cobb Cty. Sch. Dist.*, 887 F.3d 1182, 1191 (11th Cir. 2018) ("[The plaintiffs] could not have leveled the same allegations against a public library or a theater since neither are in the business of fashioning educational programs for intellectually disabled students."). Nor would an adult school employee or visitor be entitled to assert claims for denying the goals and objectives of an IEP or ensuring access to a FAPE. *Id.*; *Durbrow*, 887 F.3d at 1191; *see Paul G.*, 2018 WL 2763302, at *5.

The procedural history also weighs in favor of requiring exhaustion. *Fry*, 137 S. Ct. at 757. Prior to filing this suit, Plaintiffs filed two OCR complaints and went through mediation. *See* Doc. 1 ¶¶ 149, 154-55. The first complaint alleges that Defendants failed to follow and implement Sean's IEP and behavioral plan. Doc. 44 at 16. And the Settlement referred to the provision of a FAPE under § 504 and claims related to the educational placement, evaluation, discrimination, and services. Doc. 43 at 16-18. Plaintiffs first sought review of these allegations through the IDEA administrative process.

Plaintiffs argue that the multiple references to violations of Sean's IEP are included in Count 5 to show that Defendants were deliberately indifferent to Sean's constitutional rights, which they must show to obtain damages under § 504 and Title II. Doc. 53 at 9 (citing *A.G.*, 815 F.3d at 1204). But this requirement does not change the exhaustion analysis. If the gravamen of a claim seeks relief for the denial of a FAPE, the plaintiff is required to administratively exhaust his claims prior to seeking damages and showing deliberate indifference under § 504 and the ADA. *Payne*, 653 F.3d at 875-76 (the policy behind the exhaustion provision is for all technical educational issues to go first to a local

educational agency so that they may have the first opportunity to correct shortcomings in educational programs and develop a complete factual record).

Plaintiffs also argue that Defendants wrongfully assume that references to a FAPE in the complaint referred to IDEA claims. Doc. 53 at 11. Instead, Plaintiffs assert, their claims are related only to discrimination and violations of a FAPE under § 504 and the ADA. *Id*. at 12. Plaintiffs cite *Mark H. v. Lemahieu*, 513 F.3d 922, 933 (9th Cir. 2008), to support this proposition. In *Mark H.*, the Ninth Circuit reversed a district court decision holding that the IDEA was the sole remedy for violations of a FAPE. *Id*. at 933-34. In concluding that such remedies were available under both the IDEA and § 504, the Ninth Circuit cited to the exhaustion provision's specific preservation of those remedies. *Id*. Plaintiffs' argument merely points out the overlapping remedies addressed by the exhaustion provision and *Fry*. *Fry*, 137 S. Ct. at 749-50. Although the Ninth Circuit recognized that the FAPE provisions in each statute are "similar but not identical," nowhere did it state that a § 504 claim for a FAPE can be pursued without exhaustion. *Id*. at 933. In fact, the plaintiffs in *Mark H*. exhausted their administrative remedies. *See id*. at 935 n.11. The hypothetical questions and test posed by *Fry* are designed to address these overlapping liabilities and ensure that all claims related to a FAPE are first exhausted administratively.

### 4. Plaintiffs' Claims Have Not been Exhausted.

Plaintiffs argue that the exhaustion requirement was satisfied by the parties' participation in OCR mediation and the Settlement. Doc. 53 at 13. Plaintiffs assert that exhaustion is not a rigid requirement, and that the plain text of the IDEA does not require a "full due process hearing to exhaust administrative remedies." *Id*. Plaintiffs are correct that there are multiple exceptions to administrative exhaustion, including futility, inadequacy, and systemic failure. *Hoeft*, 967 F.2d at 1303. But Plaintiffs do not suggest that any of these exceptions apply here.

The IDEA requires exhaustion of the procedures under both subsection (f) and subsection (g) of § 1415. 20 U.S.C. § 1415(l) ("before the filing of a civil action . . . , the

procedures under subsections (f) and (g) shall be exhausted[.]"). Subsection (f) outlines the procedures for an impartial due process hearing, and subsection (g) outlines the procedures for appealing the result of the impartial hearing. 20 U.S.C. § 1415(f)-(g). Plaintiffs assert that they participated in a mediation session, which is an alternative to the due process hearing under § 1415(f)(1)(B). Doc. 53 at 13. A resolution meeting under § 1415(f)(1)(B) may be convened by the local educational agency and members of the IEP to give parents an opportunity to discuss their complaint and the agency an opportunity to resolve the complaint. § 1415(f)(1)(B). Plaintiffs assert that because the resolution meeting resolved all of their IDEA claims through the Settlement, no further exhaustion is required and they are free to assert claims under § 504 and the ADA. Doc. 53 at 14.

But if Plaintiffs' ADA and § 504 claims essentially seek redress for a denial of a FAPE, which the Court finds they do, Plaintiffs are required to fully exhaust their claims pursuant to § 1415(l). This involves satisfaction of both subsections (f) and (g). *See* 20 U.S.C. § 1415(l). Thus, even if the mediation process satisfied the requirements of subsection (f), Plaintiffs still must satisfy subsection (g) before bringing this case in federal court. *See A.F. ex rel. Christine B. v. Espanola Pub. Schs.*, 801 F.3d 1245, 1248 (10th Cir. 2015) (participating in mediation and satisfying requirements of subsection (f) not sufficient for exhaustion). Plaintiffs' claims have not been administratively exhausted.

### C. Conclusion.

Counts 2, 3, and 7 are barred by the Release. The Court will grant Defendant's motion for summary judgment on those counts. Count 5 requires administrative exhaustion, and the Court will dismiss it without prejudice. *Payne*, 653 F.3d at 881 ("Unlike judgment on the merits, a plaintiff's failure to exhaust administrative remedies should result in dismissal without prejudice."); *see also City of Oakland, Cal. v. Hotels.com LP*, 572 F.3d 958, 962 (9th Cir. 2009).

## V. The District's Motion.

The District moves for summary judgment on Plaintiffs' state law claims – Counts 8-14 – for failure to timely serve notices of claim on the individual Defendants and failure

to file suit within the applicable statue of limitations. Doc. 44 at 2. The District also moves for summary judgment on Count 14 – violation of Arizona's restraint and seclusion statute – because § 15-105 does not provide a private right of action. *Id.*

### A. Notice of Claim for the Individual Defendants.

Under A.R.S. § 12-821.01(A), a party with a claim against a public entity must serve a notice of a claim within 180 days after the cause of action accrues. The notice of claim must contain facts sufficient to permit the public entity to understand the basis on which liability is claimed. *Id.* Any claim not served within this time limit is barred. *Falcon ex rel. Sandoval v. Maricopa County*, 144 P.3d 1254, 1256 (Ariz. 2006). When a claimant asserts a claim against a public employee acting within the course and scope of his or her employment, the claimant must give notice of the claim to both the employee and to the employer. *Crum v. Super. Ct. for Cty. of Maricopa*, 922 P.2d 316, 317 (Ariz. Ct. App. 1996).

A cause of action accrues "when the damaged party realizes he or she has been damaged and knows or reasonably should know the cause, source, act, event, instrumentality or condition which caused or contributed to the damage." A.R.S. § 12-821.01(B). The term "accrual" is construed in accordance with the common law discovery rule, which "provides that a cause of action accrues when a plaintiff discovers or reasonably should have discovered the injury was caused by the defendant's negligent conduct." *Stulce v. Salt River Project Agric. Improvement & Power Dist.*, 3 P.3d 1007, 1010 (Ariz. Ct. App. 1999). "It is not enough that a plaintiff comprehends the 'what'; there must also be a reason to connect the 'what' to a particular 'who' in such a way that a reasonable person would be on notice to investigate whether the injury might result from fault." *Walk v. Ring*, 44 P.3d 990, 996 (Ariz. 2002).

In *Walk,* the Arizona Supreme Court addressed when a cause of action accrues. *Walk* stated that "it is not enough" for the plaintiff to comprehend that something has gone wrong – referred to in Walk as the "what" of the plaintiff's potential claim. 44 P.3d at 996. Rather, "there must also be reason to connect the 'what' to a particular 'who' in such a way

that a reasonable person would be on notice to investigate whether the injury might result from fault." *Id.*

### 1. Plaintiffs' Claims.

Plaintiffs' state law claims for battery and assault (Counts 8 and 9) against Satterlie, Akmon, Telep, and Lopez require a showing that the individual Defendants' conduct was harmful or offensive. *Duncan v. Scottsdale Med. Imaging, Ltd.*, 70 P.3d 435, 438 (Ariz. 2003). Plaintiff's state law claims for negligence, gross negligence, and negligent hiring (Counts 11-13) alleged against several individual Defendants require a showing that the individual Defendants acted outside of a reasonable standard of care. *Gipson v. Kasey*, 150 P.3d 228, 230 (2007). And Plaintiffs' Count 14 for violation of § 15-105 requires a showing that the statute was violated.

Because § 15-105 allows restraint and seclusion in specific situations, every CPI hold or restraint used in a public-school setting will not constitute a harmful or offensive injury or a breach of reasonable care. To be outside the permissible bounds of § 15-105, the restraints or holds must have been used when the student's behavior did not present an imminent danger, when there were less restrictive interventions available, or when employed by personnel who were not trained in the safe and effective use of restraint and seclusion techniques. § 15-105(A)-(B). Thus, the pertinent question is when Plaintiffs knew or should have known the restraints used on Sean were outside the bounds of § 15-105.

Plaintiffs served a notice of claim on the District on July 14, 2017, and served notices of claim on the individual Defendants on January 26, 2018. Doc. 54 at 5-6. Defendants assert that Plaintiffs' claim accrued on January 23, 2017, when they became aware of the use of CPI techniques on Sean. Doc. 44 at 4, 13. Thus, Defendants argue, Plaintiffs' notices of claim were not served on the individual Defendants within the 180-day limit. Doc. 44 at 4. Plaintiffs respond that although they learned of Telep and Akmon's CPI holds by January 23, 2017, they did not know if their holds were in accordance with the law. Doc. 54 at 4.

On January 24, 2017, following the January 23 receipt of information about the CPI holds, Plaintiffs filed their first complaint with the OCR.  *See* Docs. 1 ¶ 149, 44 at 16.  The complaint alleged several errors in the administration of Sean's IEP and behavioral support.  Doc. 44 at 16.  It also alleged that Telep used CPI holds on Sean, that Satterlie did not notify the McCarthys as required, and that Sean was injured by a CPI hold on January 19, 2017.  *Id.* at 16-17.  On January 23, 2017, Plaintiffs requested information on all of the dates and times CPI restraint and seclusions were used on Sean, and the reasons they were used.  Doc. 1 ¶ 150.  In February 2017, Plaintiffs requested that the District provide additional records including: (1) documentation showing the training and certification of persons who restrained Sean; (2) all documentation regarding the employees who were allegedly injured by Sean and took time off due to these injuries; (3) any and all notes from Sean's BIP and IEP team; and (4) all documentation regarding support materials used by the School.  *Id.* ¶ 151.  Plaintiffs allege that several documents were missing from the responses to this request and that they did not receive any of the requested training documentation.  *Id.* ¶¶ 152, 153.

As noted above, the Settlement required the District to provide the McCarthys with: "(1) emails related to Sean from between January 2016 and May 2016, and between March 2015 and December 2015"; and (2) "CPI certifications of Sean's teachers and paraprofessionals during the 2016-2017 school year, or to provide confirmation that [the District] had already provided all such documentation within its custody and control."  *Id.* ¶ 156.  The District failed to provide this documentation by the agreed upon date of May 31, 2017.  *Id.* ¶ 158.  On June 5, 2017 the District provided "some, but not all," of the documents required by the Settlement.  *Id.* ¶ 159.  They still did not give Plaintiffs the information about the teacher and staff CPI certifications.  *Id.* ¶ 160.  The District also failed to provide other required documents, such as incident reports and correspondence related to the January 19 incident.  *Id.* ¶ 161.

On August 21, 2017, the District provided Plaintiffs a copy of a corrective action memorandum stating that Satterlie used CPI holds without certification and failed to

communicate the use of holds to the parents. Doc. 44 at 5. As a result, Plaintiffs filed a public records request to obtain all documents related to Satterlie's corrective action memorandum. Docs. 53 at 61, 54 at 5. The District denied the request, stating that the "interests of confidentiality, privacy, and the best interests of the State outweigh the public's interest in the disclosure." Doc. 53 at 65. On December 15, 2017, Plaintiffs received an e-mail from Sean's former math teacher with a copy of the January 19 incident report. Doc. 54 at 6. Defendants never provided Plaintiffs this draft report, nor the e-mails that accompanied it. *Id.* Plaintiffs served their notices of claim on the individual Defendants on January 26, 2018, within 180 days of receiving the Satterlie memorandum. Doc. 154 at 6. Plaintiffs identify the Satterlie memorandum as the date their causes of action accrued for all of the individual Defendants.

Plaintiffs allegations in the complaint provide very little information about how they concluded that Sean was subjected to the various offensive CPI holds by the alleged individual Defendants, or that the other individual Defendants were negligent or grossly negligent. It is also unclear what information Plaintiffs received in the various deliveries from Defendants. Defendants provide no information to clarify these facts.

Two documents in the record identify individual Defendants – the first OCR complaint and the Satterlie corrective action memorandum. Mary's affidavit also indicates that she knew as of January 23, 2017 that Akmon performed CPI holds on Sean. Doc. 53 at 19 ¶ 5. Defendants assert that, based on the first OCR complaint, Plaintiffs' knew of the possible fault of all of the individual Defendants because Plaintiffs knew about the CPI holds. But the CPI holds are the "what," not the "who." *Walk*, 44 P.3d at 996. There is no indication from the OCR complaint or other information provided by the parties that Plaintiffs knew who was performing CPI holds with the exception of Telep and Akmon.

The Court finds that Plaintiffs' claims against Telep and Akmon accrued on January 23, 2017, the date Plaintiffs became aware that Sean was injured and that Telep and Akmon performed CPI holds. Even if Plaintiffs did not know all of the facts sufficient to determine whether Akmon and Telep performed the holds negligently or were properly

trained, Plaintiffs had enough information for a reasonable person to be on notice to investigate. *See Walk*, 44 P.3d at 998. Indeed, after that date, Plaintiffs filed an OCR complaint and hired counsel. *See Little v. State*, 240 P.3d 861, 864-65 (Ariz. Ct. App. 2010) (finding medical malpractice cause of action accrued no later than when plaintiff filed a medical board complaint for negligent care against the doctor).[5]

The same is true for Plaintiffs' § 15-105 claims against Satterlie. The first OCR complaint demonstrates that on January 23, 2017, Plaintiffs became aware that CPI holds were used and that Satterlie was not reporting them to the McCarthys. The parents clearly were aware at that time that Satterlie was violating § 15-105.

Although the state law claims against Telep, Akmon, and Satterlie were served well after the 180-day deadline, the Court must address other arguments before deciding whether summary judgment on the claims is warranted. The Court cannot conclude, based on the limited and indefinite timeline provided, that Plaintiffs' claims accrued on January 23, 2017 for the remaining individual Defendants. Plaintiffs were aware that an injury occurred to Sean, but outside of the individuals named above, the OCR complaint does not identify who caused the injury or whether the injury was attributable to fault. Because Defendants do not point to any additional information showing Plaintiffs were aware of the remaining individual Defendants' fault, the Court will not grant summary judgment on those claims. *See Celotex*, 477 U.S. at 323.

### B.  Tolling Based on Unsound Mind.

Plaintiffs argue that the limitations periods should be tolled for Sean's state law claims because he was incapacitated when the claims accrued. Doc. 54 at 8-10. A.R.S.

---

[5] Plaintiffs also argue that a finder of fact could determine that one or all of the individual Defendants were not acting within the course or scope of their employment, "rendering them individually liable without requiring compliance with Arizona's notice of claims statutes." Doc. 54 at 10 n.2. But Plaintiffs' complaint alleges that "each of the Defendants was, except where stated, the agent, employee, servant, and/or co-venturer of each of the other Defendants and was acting within the scope of said agency, venture, and/or employment[.]" Doc. 1 ¶ 10. At no point do Plaintiffs make any allegations that the individual Defendants acted outside the scope of their employment. Several allegations state that Defendants' actions were done "within the course and scope of Defendants' employment and were therefore done under the color of law." *Id.* ¶¶ 183, 187, 199.

§ 12-502 provides for the tolling of state law statutes of limitation for periods during which a plaintiff is of unsound mind and applies to the limitations period for notices of claim against public entities. *See* A.R.S. § 12-821.01(D). The parties agree that Sean is of "unsound mind" due to his disability, but dispute whether these provisions apply when the McCarthys have asserted claims on Sean's behalf. *See* Docs. 44 at 5, 54 at 8.

The legislature provided no exceptions to the application of § 12-502, and Arizona courts have found that an individual's claim will be tolled even if the individual has a parent or guardian who can assert the claim on his behalf. *Kiley v. Jennings, Strouss & Salmon,* 927 P. 2d 796, 801-02 (Ariz. Ct. App. 1996) (finding no exception if the minor or individual is appointed a guardian or conservator); *Sahf v. Lake Havasu City Ass'n for the Retarded & Handicapped*, 721 P.2d 1177, 1181 (Ariz. Ct. App. 1986) (finding no exception even after the guardian asserted a claim).

In *Sahf*, the mother and guardian of an individual with a disability filed a personal injury claim on behalf of her son after the expiration of the statute of limitations. 721 P.2d at 1179. In allowing the claim, the Arizona Court of Appeals disagreed with the defendants' arguments that (1) § 12-502 should not apply because the disability of an individual with "unsound mind" will never terminate, and allowing a suit to be tolled indefinitely would frustrate the purpose of the statute; and (2) § 12-502 protects the ability to sue, so once a party has a guardian to initiate suit the statute is no longer necessary. *Id.* at 1181. The *Sahf* court relied on the Arizona Supreme Court's decision in *Barrio v. San Manuel Division Hospital for Magma Copper, Co.*, 692 P.2d 280 (Ariz. 1984). *Sahf*, 721 P.2d at 1181. In *Barrio* the court found that a minor's personal injury action was tolled regardless of whether the minor had a parent or guardian. 692 P.2d at 286. Considering the statutory language and these state law decisions, the Court will apply § 12-502 to toll Sean's state law claims and notice of claims limitations period.

Defendants argue that no cases address the specific situation in this court "where the disabled Plaintiff's parents have been vigorously pursuing claims on his behalf." Doc. 56 at 7. They assert that once the McCarthys "took action on [Sean's] behalf, they

were obligated to comply with court rules and applicable statues, including the notice of claim statute and the statute of limitations." Doc. 44 at 6.  Defendants cite *Little v. State*, 240 P.3d 861, 865 (Ariz. Ct. App. 2010)), where the plaintiff alleged a medical malpractice claim after her daughter died.  *Id.* at 862.  Prior to filing her lawsuit, the plaintiff authorized a local television reporter, Johnson, to file a complaint with the Arizona Medical Board on her behalf.  *Id.* at 863.  On February 7, 2008, the Board determined that the doctor who treated the plaintiff's daughter had behaved unprofessionally.  *Id.*  The plaintiff served a notice of claim on the doctor on May 15, 2008, asserting that her claim did not accrue until the Board's decision.  *Id.*  The Arizona Court of Appeals disagreed because the plaintiff "knew of and specifically authorized Johnson to file the Board complaint; therefore, he was acting as [the plaintiff's] agent when he did so on her behalf."  *Id.* at 865.  Because Johnson's knowledge and actions were imputed to the plaintiff, she was deemed to have sufficient knowledge to trigger the limitations period.

*Little* addresses when a cause of action accrues for a competent principal who knowingly authorizes her agent to initiate a complaint on her behalf.  It says nothing about tolling based on incompetency or A.R.S. § 12-502, and it certainly cannot be read as obviating the holdings in *Sahf* and *Barrio* that § 12-502 applies even where guardians have the power to pursue claims.

The Court also finds unpersuasive Defendants' remaining policy arguments that allowing tolling for Sean's claims "would create an 'intolerable burden' on the District, which would be subject to revived and newly asserted claims during [Sean's] entire lifetime."  Doc. 44 at 7.  Defendants cite several out-of-state court decisions involving minor plaintiffs who repeatedly filed and dismissed and refiled claims during the period that the statute of limitations was tolled.  Doc. 44 at 6 (citing *Ater v. Follroad*, 238 F. Supp. 2d 928, 948-49 (S.D. Ohio 2002); *Bernstein v. Gottlieb Mem. Hosp.*, 542 N.E. 2d 20 (1989)).  But as Plaintiffs point out, nothing about § 12-502 would affect a court's ability to dismiss an action with prejudice if a plaintiff engages in abusive litigation practices.  *See* Fed. R. Civ. P. 41; *Ajanovic v. O.F.F. Enters., Ltd.*, No. CV 10-2482-PHX-DGC, 2012 WL

549876, at *3 (D. Ariz. Feb. 21, 2012). Additionally, the argument that a minor plaintiff could assert new causes of action five, ten, of twenty years in the future was considered and rejected in *Sahf*. *See* 721 P.2d at 1181-82 (finding interest in protecting the constitutional right to recover for individuals with disabilities outweighed protecting defendants from stale claims).

All parties agree that Sean is an incapacitated individual within the meaning of § 12-502. *See* Docs. 44 at 6-7, 54 at 10. The Court will therefore apply that statute and § 12-821.01(D) to toll the notice of claim period and the statutory limitations period for Sean's claims. Accordingly, the Court will not grant summary judgment on Sean's Counts 8 and 9 against Telep and Akmon and Count 14 against Satterlie.

### C. Equitable Estoppel and Tolling.

Plaintiffs assert that the notice of claim period should be equitably tolled or estopped for the McCarthys' claims (Counts 12 and 14) against Telep, Akmon, and Satterlie, because Defendants prevented Plaintiffs from learning about the use of CPI on Sean. *Doc. 54* at 7.

The notice of claim statute is subject to equitable estoppel and tolling. *Jones v. Cochise County*, 187 P.3d 97, 104 (Ariz. Ct. App. 2008) (quoting *Pritchard v. State*, 788 P.2d 1178, 1183 (1990)). Equitable estoppel applies if "(1) the party to be estopped intentionally or negligently induces another to believe certain material facts, (2) the induced party takes actions in reliance on its reasonable belief of those facts and (3) the induced party is injured by so relying." *Pueblo Santa Fe Townhomes Owners' Ass'n v. Transcontinental Ins.*, 178 P.3d 485, 493 (Ariz. Ct. App. 2008). Equitable tolling allows a plaintiff to sue after a statutory time period "if they have been prevented from filing in a timely manner due to sufficiently inequitable circumstances." *McCloud v. State, Ariz. Dep't of Pub. Safety*, 170 P.3d 691, 696 (Ariz. Ct. App. 2007). Plaintiffs bear the burden of proving they are entitled to either relief. *Id.*

As discussed above, Plaintiffs knew in January 2017 that Sean was subjected to CPI holds by Telep and Akmon, Satterlie was not reporting the holds in violation of § 15-105, and Sean had been injured by at least one of the holds. Plaintiffs allege that they filed

numerous unanswered requests for the appropriate documents and therefore they unable assert their notices of claim against the individual Defendants. But there are too many gaps in Plaintiffs' assertions to find they have met the burden for equitable relief. In their allegations that Defendants failed to provide specific records and documents, Plaintiffs do not address what is missing or why the documents they had were insufficient to allege claims against Telep and Akmon. Additionally, while Plaintiffs stress that Defendants failed to provide certain information, they make no arguments showing that Defendants intentionally or negligently induced Plaintiffs to believe certain facts related to these specific use of CPI holds. Plaintiffs have not shown that estoppel is warranted.

Similarly, Plaintiffs have not shown what extraordinary circumstances beyond their control warrant equitable tolling. *Alvarez-Machain v. United States*, 107 F.3d 696, 701 (9th Cir. 1996). Plaintiffs claim that the fact Sean is nonverbal and could not tell his parents what happened, and his parents therefore had to find out through Defendants, was "sufficiently inequitable" to toll the notice of claim period. But this argument does not explain why the information Plaintiffs relied on to submit their notice of claim to the District was not enough to submit notices of claim against Telep, Akmon, and Satterlie. This argument also fails to explain what Plaintiffs received in their document requests and what was missing, and why the Satterlie corrective action gave Plaintiffs notice when the other information did not. *Collins v. Artus*, 496 F. Supp. 2d 305, 313 (S.D.N.Y. 2007) ("To establish extraordinary circumstances, a petitioner must support his allegations with evidence; he cannot rely solely on personal conclusions or assessments."). Plaintiffs have not shown that the parents are entitled to equitable tolling.

### D. Statute of Limitations.

Defendants assert that Plaintiffs' state law claims were not filed in this Court within the applicable statute of limitations. Doc. 44 at 5. Defendants argue that Plaintiffs' claims accrued on January 23, 2017, and their lawsuit was untimely when filed on May 1, 2018. Doc. 44 at 5.

All actions against public entities or employees must be filed within one year of accrual.  A.R.S. § 12-821.  The Court must apply the same accrual test discussed above.  *See Rogers v. Bd. of Regents of Univ. of Ariz.*, 311 P.3d 1075, 1078 (Ariz. Ct. App. 2013) (applying A.R.S. § 12-821.01(B)).

As noted above, there is a genuine dispute of fact regarding when Plaintiffs' claims against most of the individual Defendants' accrued because it is unclear when Plaintiffs became aware of those Defendants' involvement with Sean.  But Plaintiffs were on notice of the District's possible misconduct when they were on notice of the misconduct of the District's special education employees – January 23, 2017.  As the employer of Satterlie, Akmon, and Telep, the District was immediately recognizable as potentially at fault when the McCarthys realized Sean was injured by CPI holds.  This is evidenced by Plaintiffs' January 24, 2017 OCR complaint, which identified the District as the liable institution.  Doc. 44 at 16; *Walk*, 44 P.3d at 996.

Thus, the accrual date for the state law claims against the District is the same as the accrual date for the claims against Satterlie, Telep, and Akmon – January 23, 2017.  As a result, Plaintiffs' filing of suit on May 1, 2018 was untimely under the applicable one-year limitations period.

Plaintiffs provide this response:

> There is substantial evidence that John and Mary's state law claims in [Counts 12 and 14] did not accrue before August 21, 2017, when Plaintiffs were provided with the Satterlie memorandum.  Because Plaintiffs filed their Complaint in this matter on May 1, 2018, if the finder of fact were to determine that John and Mary's state law claims did not accrue until August 21, 2107, then the claims were brought within the time in A.R.S. § 12-821.

Doc. 54 at 8.  The Court disagrees.

Plaintiffs' gross negligence claim alleges that (1) Sean was being restrained without notifying his parents in violation of § 15-105; and (2) Defendants assured the McCarthys that Sean had a behavior plan and continued to progress academically, but in reality they kept track of his behaviors and did not notify the McCarthys of an increasing frequency of

bad behaviors.  Doc. 1 ¶¶ 253-54.  Count 14 alleges that Defendants violated § 15-105 by not notifying the McCarthys when restraints were used on Sean and by failing to review the strategies used to address Sean's behavior and analyze how future incidents may be avoided pursuant to the statue.  *Id.* ¶¶ 275-77.  As explained above, Plaintiffs knew of the CPI holds and that the District was violating § 15-105 by January 23, 2017.  And Plaintiffs knew of, or were on notice of, all of their state law allegations against the District when they filed their first OCR complaint on January 24, 2017.  Doc. 44 at 16.

Plaintiffs' state law claims against the District are barred by the statute of limitations.  Sean's claims, however, are tolled under A.R.S. § 12-502.

### E.      Implied Right of Action Under A.R.S. § 15-105.

Defendants argue that Plaintiffs cannot assert a claim for damages under A.R.S. § 15-105 because the statute does not create a private right of action.  Doc. 44 at 7.  Arizona law implies a private right of action more broadly than federal law.  *Chavez v. Brewer*, 214 P.3d 397, 405-06 (Ariz. Ct. App. 2009).  Courts imply a private right of action when doing so is consistent with "the context of the statutes, the language used, the subject matter, the effects and consequences, and the spirit and the purpose of the law."  *Transamerica Fin. Corp. v. Superior Court*, 761 P.2d 1019, 1020 (1988).  In *Transamerica*, the Arizona Supreme Court held that the Consumer Loan Act provided an implied private right of action because the spirit and purpose of the act was to protect borrowers and a previous Court decision recognized an implied right to enforce the provisions of an antecedent statute – the Small Loan Act – which was upheld by the legislature in the act's amendments and modifications.  *Id*. at 1021.

Arizona courts have declined to find an implied right of action where third persons are only incidental beneficiaries of the statutory enactment.  *See Lancaster v. Ariz. Bd. of Regents*, 694 P.2d 281, 287 (Ariz. Ct. App. 1984) ("[T]he enactment's specification that the report was to be made to the legislature for the legislative implementation necessarily precludes private judicial enforcement by third persons who are incidental beneficiaries of the contemplated report."); *see also Guibault v. Pima County*, 778 P.2d 1342, 1344 (Ariz.

Ct App. 1989). Similarly, where the statute's intended benefit was something broad, not designed for a special class of voters, the Arizona Court of Appeals has found no implied right of action. *See McNamara v. Citizens Protecting Tax Payers*, 337 P.3d 557, 559-60 (Ariz. Ct. App. 2014) ("[C]ampaign finance laws are intended to benefit the voting public by, among other things, ensuring the transparency and integrity of the process.").

The Arizona Court of Appeals found an implied private right of action in statutes enacted to effectuate the Help America Vote Act ("HAVA"). *Chavez*, 214 P.3d at 400. Section 16-442.01, provided that voting systems used in the state "must provide persons who are blind or visually impaired with 'access to voting that is equivalent to that provided to persons who are not blind or visually impaired.'" *Id*. Section 16-442 provided that "only machines that comply with HAVA may be approved, incorporating HAVA's requirement that each polling place provide at least one voting system equipped for individuals with disabilities and accessible to voters in alternative languages." The court found that the legislature enacted this statute (and related statutes) to "clearly benefit individuals with disabilities." *Id*. at 318. Because the statutes were intended to benefit individual members of a special class, and the plaintiffs were members of that class, the court found an implied right of action to assert claims for relief. *Id.*; *see also Napier v. Bertram*, 954 P.2d 1389, 1392-93 (Ariz. Ct. App. 1998) (finding private right of action where the statutory goal of the Financial Responsibility Act was to protect the traveling public from financial hardship).

In *Douglas v. Governing Board of Window Rock Consolidated School District No. 8*, 78 P.3d 1065 (Ariz. Ct. App. 2003), the Arizona Court of Appeals found an implied right of action in A.R.S. § 15-952, which provided that any additional funding granted to schools should be allocated to additional teacher compensation. *Id*. at 1067. The teachers alleged that the school received funds but failed to allocate the money for additional teacher compensation. *Id*. The court stressed that a primary goal of the statute was to provide teacher compensation because it was conditioned on the passage of a proposition that allowed additional compensation. *Id*. at 1068. The court also emphasized that the title of

the statue was "additional monies for teacher's compensations, which indicated that the focus was on the teacher's pay despite the fact that it was placed among statutes addressing school budgets. *Id.* Without a private cause of action, the court reasoned, there would be no remedy for misappropriation of the earmarked teacher funds. *Id.*

There appear to be two primary purposes of § 15-105. First, there is a regulatory goal to identify when schools are permitted to use restraint and seclusion techniques and how those techniques should be implemented. §15-105(A)-(C). Second, there are the reporting requirements that focus on parental notification and documentation. § 15-105(D)(1)-(2).

Regarding the first purpose, the Court does not find an implied right of action for students or parents. Unlike *Chavez* and *Douglas*, language and direction in the statute is focused on the school's responsibility and authorization, not the rights of the students and parents. The context and intent of the statute reinforces the Court's decision. Individuals testifying for the bill stressed that the bill would be used to assist special education attorneys but not necessarily for litigation. *See Use of Restraint and Seclusion Techniques; Requirements; Definitions: Hearing on S.B. 1459 Before the H. Judiciary Comm.*, 2015 52nd Leg., 1st Reg. Sess. 1:39:40-1:41:02 (Ariz. 2015) [hereinafter March 18 Hearing]; *see also* Doc. 59 at 14-15. Further, foreclosing a private right for students and parents will not eliminate all possible remedies and enforcement, as individuals could still bring personal injury lawsuits and OCR complaints. *See* March 18 Hearing at 1:34:56-1:35:05 (testifying that parents file personal injury lawsuits and OCR complaints to address improper restraints, but they want the restraint and seclusion statute to have a law "on the books" because the schools will follow it first).

Regarding the second purpose, the Court finds an implied right of action for parents. The statutory language directs the school to provide the proper report and documentation to parents whenever a restraint or seclusion technique is used. As argued by Plaintiffs, legislative hearing testimony on § 15-105 focused on both the need to govern restraints and the importance of early and frequent parental notification. *See* March 18 Hearing at

1:04:30 ("We need to have parents being notified when these types of procedures are used in the classroom.") (statement by bill sponsor); *id.* at 1:10:58-1:11:31 (testifying the importance parental notification especially where children are nonverbal) (statement by President of Autism Society); *see also Use of Restraint and Seclusion Techniques; Requirements; Definitions: Hearing on S.B. 1459 Before the S. Educ. Comm.*, 2015 52nd Leg., 1st Reg. Sess. 51:00 (Ariz. 2015) [hereinafter Feb. 19 Hearing] (parent testifying that parents have the right to know what happens in the school and to the children); *id.* at 1:40:00 (parent stressing burdens on parents from lack of communication with the school district), 1:56:12 (parent testifying of daily incidents where parents were not notified). In this situation, like that in *Chavez* and *Douglas*, § 15-105 provides benefits for a specific class of individuals whose children are subjected to restraint and seclusion, in the form of notification and documentation of the incidents.

Most importantly, if there is no private right of action for parents, there is no remedy for the enforcement of the parental notification provisions. There is no administrative review, no common law remedy, nor any federal IDEA or § 504 remedy that requires parents to receive notification when restraint or seclusion is used on their student. *See Douglas*, 78 P.3d at 1069 (finding an implied right because it was the only way to enforce the statute); *Guibault*, 778 P.2d at 1345 (no private implied right where county provided an administrative review and the legislature tacitly approved by not amending the statute to include a right to judicial review).

Defendants point to A.R.S. § 15-239 as the appropriate enforcement statute for § 15-105 because "the legislature charged the State Board of Education with monitoring school districts to ascertain that laws applying to the school districts are implemented as prescribed by law." Doc. 44 at 8 (internal citations and quotation marks omitted). But § 15-239 only provides that the Department of Education "may monitor school districts[.]" § 15-239(A). It does not authorize private lawsuits to enforce these provisions.

Defendants also argue that the statute's reporting procedures are "regulatory in nature." Doc. 44 at 9. "The requirement that a school or school district create policies and

procedures does not, alone, give an individual a right of action based on the allegation that such procedures were not followed." *Id.* (citing *Lancaster*, 694 P.2d at 287). In *Lancaster,* after reviewing the legislative history, the court determined that the "sole and exclusive purpose of the legislative enactment" was to require the Board of Regents to prepare and submit a report to the legislature with a plan to develop a system of wage and salary equivalency and a plan for the legislature to implement the plan. 694 P.2d at 287. The statutory language clearly was focused on informing the legislature. And the legislative history of the bill supported no private right, as originally the bill required that "equivalent salaries be paid," but that version was rejected in favor of the version requiring the submission of a plan to the legislature. *Id.* at 287-88.

Here, unlike *Lancaster*, one of the overall purposes of the statute is to provide proper parent notification when restraints and seclusion are used. To achieve this purpose, the legislature directed schools to adopt policies that requires them to provide specific notifications to parents within set periods. Unlike *Lancaster*, where the recommended policy would still need to be implemented by the legislature prior to conferring any benefit on the salary recipients, the schools are required to confer a benefit on the parents.

The Court finds an implied right under § 15-105 for the McCarthys, but not for Sean. The Court will grant summary judgment on Sean's Count 14, but not on the McCarthys'.

### F. Conclusion.

Plaintiffs' did not file notices of claim within the 180-day limitations period for individual Defendants Telep (all claims), Akmon (all claims), and Satterlie (Count 14). Plaintiffs also did not file suit against the District within the one-year statute of limitations. Sean's state claims are timely because they were tolled due to his incapacity.

The Court will grant summary judgment on Count 12 as it pertains to the McCarthys' claims against Telep, Akmon, and the District. The Court will also grant summary judgment on the McCarthys' Count 14 claim as it pertains to Satterlie and the District. Further, because there is no implied right of action for students under § 15-105, the Court will grant summary judgment on Sean's claim in Count 14.

**VI.    Conclusion.**

The Court will grant summary judgment on the following: (1) Counts 2, 3, and 7 as having been released by the parties' Settlement; (2) the McCarthys' Count 12 against Telep, Akmon, and the District; (3) the McCarthys' Count 14 against Satterlie and the District; and (4) Sean's Count 14.  The Court will dismiss Count 5 without prejudice.

The following claims remain: (1) Sean's claim for violation of rights under the Fourth Amendment (Count 1); (2) Sean's § 1985 claim for a conspiracy to interfere with civil rights (Count 4); (3) Mary's claim for retaliation in violation of § 504 (Count 6); (4) Sean's claim for assault (Count 8); (5) Sean's claim for battery (Count 9); (6) Sean's claim for aiding and abetting tortious conduct (Count 10); (6) Sean's claim for negligence (Count 11); (7) the McCarthys' claim for gross negligence against all Defendants except the District, Telep, and Akmon (Count 12); (8) Sean's claim for negligent hiring, training and supervision (Count 13); (9) the McCarthy's claim for violation of § 15-105 except as to Satterlie and the District (Count 14).

**IT IS ORDERED:**

1.    Defendant Satterlie's motion for summary judgment (Doc. 43) is **granted**; Plaintiffs' Counts 2, 3, and 7 are **dismissed** and Count 5 is **dismissed without prejudice**.

2.    Defendants' motion for partial summary judgment (Doc. 44) is **granted** as to the McCarthys' state law claims against Telep, Akmon, and the District and Sean's § 15-105 claim, and **denied** as to all other state law claims.

3.    Within 14 days of this order, the parties shall file a joint memorandum setting forth their proposal for the second (and final) phase of this litigation.

Dated this 23rd day of August, 2019.

*David G. Campbell*

David G. Campbell
Senior United States District Judge